### SNOOK *v.* SNOOK.

1. DIVORCE—EXTREME CRUELTY.
   Wife's charge of extreme cruelty upon which divorce was granted *held,* not established by evidence.

2. SAME—DESERTION.
   Husband's charge of desertion on cross-bill *held,* sustained by sufficient evidence to warrant decree therefor.

Appeal from Wayne; Jayne (Ira W.), J. Submitted June 12, 1934. (Docket No. 114, Calendar No. 37,752.) Decided October 1, 1934.

Bill by Ruth Snook against Fred Snook for divorce on ground of extreme cruelty. Cross-bill by defendant for divorce on ground of desertion. Decree for plaintiff. Defendant appeals. Reversed and decree ordered entered for defendant on cross-bill.

*Hugh C. Chedester,* for plaintiff.

*Chester J. Morse,* for defendant.

NELSON SHARPE, C. J. The plaintiff and defendant were married on March 5, 1926. They had known each other since childhood, and were then about 50 years of age. They had both been married before. His adopted son and her grandson were living with them. On May 22, 1926, about 11 weeks after their marriage, she left their home near Redford, taking all of her belongings with her, and they have not lived together since.

On April 20, 1932, she filed the bill of complaint herein, praying for a divorce on the ground of extreme cruelty. He answered, denying the allegations, and in a cross-bill sought divorce on the ground of desertion. The trial court granted her a decree, from which he has appealed.

Her only complaint was that he was neglectful of her, and would not take her with him to places to which she wanted to go. He was a motorman in the employ of the Detroit Street Railway, and had to report for work at 5:38 in the morning, and at a place 14 miles from their home. He had a married daughter living near this place, and, as plaintiff tes-

tified, he stayed at his daughter's "many nights because the road was so bad he could not get home." Each of them had an automobile. On the evening she left, he had arranged to take his boy to the home of his former wife, who had planned on taking him to Jackson for an outing on the following day. She testified:

"Of course when he would not take me, I was mad. He tried to be pleasant to get me to talk but I did not get over it. On Thursday, before I went to my sister's, I said, 'If you leave me there alone, I am going to leave,' and Friday he took the little boy and asked if there is anything he should bring home, and I said, 'Aren't you coming home to-night?' and he said, 'I don't think so,' and I told him several things to bring, and I took my little grandson and drove to my sister's, and I said, 'I am leaving; I will not stay there any longer alone,' and the next morning I went to see if he had come home, and I found he had not come home and I took the truck, and took my things out and left his things."

He testified that she had stopped speaking to him about the first of May; that on the night of May 21st—

"I left about 9 o'clock at night. I said, 'If it rains, I will stay with my daughter, but if it don't rain, I will come back.' I had an open car, and before I got half way down there, it started to rain, and rained nearly all night, so I stayed. I had to report at the barn at 5:38 in the morning, and it was a 14-mile drive. My daughter lived about six blocks from where I had to go to work. I told my wife where I was going that night. That is the time that my former wife wanted to take the boy to Jackson."

No corroborative proof was offered by either party. While it may have seemed apparent that

this couple could not longer live happily together at the time she left, it is also apparent that her charge of extreme cruelty was not established: The decree in her favor must be reversed and set aside.

The manner in which she left their home and remained away from it sustained the charge of desertion in his cross-bill. A decree granting him a divorce for that reason will be entered. No costs will be allowed.

POTTER, NORTH, FEAD, WIEST, BUTZEL, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred.